**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00274-CR**
_____

**MICHAEL FAULKNER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 9th District Court**
**Montgomery County, Texas**
**Trial Cause No. 21-05-06881-CR**

**MEMORANDUM OPINION**

A grand jury indicted Appellant Michael Faulkner for aggravated assault with a deadly weapon, a second-degree felony. *See* Tex. Penal Code Ann. § 22.02(a)(2). The State filed a Notice of Intent to Use Prior Conviction for Enhancement Purposes, alleging that Appellant was previously convicted of the offense of robbery. Faulkner pleaded "not guilty." A jury found him guilty as charged in the indictment. Faulkner pleaded "not true" to the alleged enhancement at the punishment phase of trial, but the jury found the enhancement "true" and assessed punishment at thirty years of

1

confinement. The trial court entered an affirmative finding on the deadly weapon allegation. In this appeal challenging his conviction, Appellant raises three issues challenging the denial of his motion to suppress, the denial of his requested jury charge on mistake of fact, and the exclusion of a video recording of the victim's statement. We affirm.

Evidence at Trial

Testimony of "Anna"[1]

Anna testified that on May 12, 2021, she was outside of her apartment where she lives. It was about 8:10 or 8:20 a.m., and she was sitting with a friend and waiting for the bus to pick up her friend's daughter. She and her friend heard gun shots and she saw a man get shot. The man who was shot was walking his dog when he was shot. Anna stated she saw the gunman, and he was wearing a dark hoodie and gloves. According to Anna, after she heard the first shots, the shooting stopped for a while but then started again. Anna testified that she also saw a vehicle with an open door behind the shooter, and when the gunfire finally stopped, the gunman got into the vehicle through the open door. Anna described the vehicle as a small four-door vehicle, with "a silver/graying color [and] a black front fender." Anna recognized the vehicle pictured in State's Exhibits 6, 7, and 8 as the vehicle she saw the gunman

---

[1] We use pseudonyms to refer to witnesses who are not affiliated with law enforcement.

leave in, and she testified that the black front fender "stood out[]" to her. Anna recalled seeing the gunman use a small handgun during the shooting.

Testimony of Sean Kennard

Sean Kennard testified that at the time of the trial he was working with a fitness company, but at the time of the shooting he was employed with the Conroe Police Department where he worked as a patrol officer, an instructor, a SWAT officer, and a field training officer. Kennard recalled that on May 12, 2021, he was dispatched to an apartment complex in Conroe shortly before 8:30 a.m. after receiving a report that someone had been shot. According to Kennard, multiple officers responded to the call, the scene was chaotic, and the victim[2] was panicked, in pain, and in a lot of distress. While attending to the victim, Kennard noticed the victim had a gunshot wound to his hand and one to his groin, and the shot to the groin was near the femoral artery. Kennard testified that EMS took the victim to the hospital. Kennard read the EMS report when he testified, and the report, admitted as State's Exhibit 12, states:

> Arrived on location with CPD and CFD to find a male laying on the floor in the apartment. The patient said that he was outside walking his dog when someone jumped out of a car and started shooting at him. He was not sure what kind of gun it was or who it was, he just ran inside. He had a wound to his right hand that had a towel wrapped around it and was no longer bleeding. He had a total of 4 wounds to his left hip,

---

[2] We do not identify the victim by name. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims the "right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

2 superficial and 2 puncture wounds, none of which were currently bleeding. When we arrived an officer was applying pressure to the wounds on the hip and stopped when we took over care. The patient was ashen and diaphoretic. He was initially hypotensive per the fire department, but was alert and oriented, answering all questions appropriately. He did not fall and never lost consciousness. He had good use of his left leg with no pain in the extremity. The hand had good range of motion and perfusion. He had no other wounds and denied any other pain. Conroe PD was able to locate a shell casing in the parking lot and it appeared to be a 9mm. The patient was transported emergency traffic to HCA Conroe where he was taken to bed 30 and report given.

A recording from Kennard's body camera from the day of the shooting was admitted into evidence and played for the jury.

Testimony of Officer Gregory Tullis

Officer Gregory Tullis, an employee of the Conroe Police Department when the shooting occurred, testified that he had previously worked as a patrol officer for the Shenandoah Police Department for about nine years and for Walmart in Conroe in its loss prevention department in the past. Tullis agreed he was familiar with the surveillance video system at Walmart. He agreed that during the investigation of the shooting, he was asked to review the 911 calls to the Conroe Police Department on May 12, 2021. Tullis testified that he also received and reviewed video from the apartment complex, which shows the shooting taking place, and the video was admitted into evidence as State's Exhibit 88 and played for the jury. Tullis testified that the video shows the victim walking with his dog, then there are two groups of

4

gunshots—eleven in the first group, and two in the second group—separated by about fifteen seconds.

Tullis's application for a search warrant in this case was admitted into evidence. Therein, Tullis stated that, after law enforcement officers chased a silver Kia with a black fender, the officers took the two people in the car into custody: Daniel McGee and Michael Faulkner. Tullis testified that, after apprehending the two men, Tullis collected their clothing, which matched the descriptions of the clothing Tullis received from witnesses' descriptions about what the men involved in the shooting were wearing at the scene where the shooting occurred, and it matched descriptions the police received in calls to 911. Tullis agreed there was a report of stolen Colorado license plates from an apartment complex that was near the Conroe Walmart. Tullis also testified that he received surveillance videos from Walmart from May 12, 2021, which were admitted into evidence, and the videos show Daniel McGee and Michael Faulkner at about 7 a.m. walking into the Walmart from a silver four-door sedan with a black right fender in the parking lot. Tullis testified that the items Daniel McGee purchased from Walmart that morning included two masks, two neck gaiters, and two pairs of gloves. Tullis testified that an out-of-state license plate was found on the suspect's vehicle, which was a silver Kia with a black fender. While investigating the incident after the shooting had occurred, Tullis learned that the vehicle had been found near the Madison and

5

Walker County line, about 40 miles from Conroe, and that the suspects, McGee and Faulkner, were initially taken after they were arrested to the Walker County jail.

Tullis testified that he obtained a search warrant to search Daniel McGee's phone. An extraction report from the phone contains GPS information that reflects McGee was at the apartment complex where the shooting occurred and that McGee performed a search on his phone to obtain the GPS location for the apartment complex at about 2:10 a.m. on May 12, 2021. Tullis testified that the extraction report also indicated someone had performed a search for an address in Dallas, performed on McGee's phone at about 8:15 a.m., which would have been "five or ten minutes[]" after the shooting. According to Tullis, the phone extraction also found a photo of a 9mm Ruger, which according to Tullis appears to be the same gun as the gun police recovered in Huntsville. Tullis further testified that there was a notepad in a backpack found in the vehicle that had the personal information of the victim written on it, including his birthday, his address at the apartment complex where the shooting occurred, the license number of the vehicle registered to the victim, and his driver's license number. Tullis also testified that the silver Kia belonged to Faulkner.

Testimony of Kenneth Posey

Officer Kenneth Posey testified that he works for the Huntsville Police Department where he is a motorcycle officer in the traffic division. He agreed he

6

was working on May 12, 2021, and at about 8:30 that morning, he was going to work, traveling north, and heard a "really loud banging" from a vehicle that was "a car [going] straight over the curve and through the grass and the dirt." According to Posey, there was a DPS trooper behind the car with its lights and sirens activated. Posey testified that he followed the trooper so he could be of assistance if necessary. Posey recalled that the suspect's vehicle was "a grayish color." According to Posey, law enforcement from several agencies were involved in the chase, including the Huntsville Police Department, the Sam Houston State University Police Department, the Texas Department of Public Safety ("DPS"), and the Madison County Sheriff's Office.

Posey testified that law enforcement officers eventually stopped the vehicle in Huntsville after they laid down spikes across the car's path. When asked if he observed Faulkner wearing a mask, Posey replied that Faulkner was wearing something "hanging around his neck that you would pick up and cover your face[]" with and a hoodie. Posey agreed he put handcuffs on one of the men and that his handcuffs were used on both men who were in the car. Posey also testified that he carries a Glock 9mm pistol, he practices with the firearm, and he fires it about "[o]nce every couple of months[,]" but Posey testified that he did not fire his pistol on the day of the incident, and he could not remember the last time he had fired it before the incident on May 12, 2021.

Posey agreed that he was wearing a body camera that day, but he did not press the button to start the camera until the chase was already underway because he was "taken by surprise[.]" The recording from Posey's body camera was admitted as State's Exhibit 110 and played for the jury.

Testimony of Officer Joe Martinez

Officer Joe Martinez, a senior patrol officer for the Huntsville Police Department, agreed he was dispatched to an address in Huntsville on May 14, 2021, pursuant to a "found property call[]" after a property owner found a weapon in his front yard. Martinez testified that the gun found was a black, 9mm Ruger. Martinez also testified that he took the gun to the police department and logged it into evidence.

Testimony of Officer E.W. Stoney Cook

Officer E.W. Stoney Cook with the Conroe Police Department testified that he was working with the crime scene division in May of 2021. Cook testified that on May 12, 2021, he responded to a call of shots fired at an apartment complex in Montgomery County, and he and Investigator Horne evaluated and documented the evidence at the scene, including taking photographs. Cook identified State's Exhibits 22 through 27 as photographs he took at the apartment complex on May 12, 2021, and he testified that the photos show bullets found at the scene which depict certain "defects" or markings on the bullets. Cook testified that several spent casings and

cartridges were collected from the apartment complex parking lot, and the photographs in State's Exhibits 28 through 31 and 64 through 69 depict those items. Cook further testified that he documented "a large blood trail that led into an apartment" at the scene that day, and he took photographs of the victim's injuries at the hospital.

Cook testified that he learned there was a high-speed pursuit of the vehicle in which the suspects were riding, the chase went into Huntsville in Walker County, and he processed the vehicle after it was brought back to Conroe. According to Cook, the vehicle was a silver Kia Optima, the license plate on the vehicle was not consistent with the vehicle's registration, and the correct plates were inside the vehicle as well as a third set of plates. Cook also testified that he found a cell phone in the vehicle, a pair of blue gloves in the glovebox, and two "durags[]"in the vehicle near the driver's side. Cook testified that a receipt from Walmart dated May 12, 2021, and timestamped 7:21 a.m. was inside the vehicle with several items listed on the receipt, including two pairs of gloves and two masks. According to Cook, packaging for two gaiter masks was in the vehicle and Cook explained that gaiter masks can be worn loosely around the neck or pulled up over the neck as a mask. Cook identified State's Exhibit 59 as a notepad on which was written the complainant's name and address at the apartment complex. Cook also testified that the firearm collected in Huntsville was a 9mm.

9

Cook agreed that he received two gunshot residue kits from another officer in this case. According to Cook, the kits include a swab to be used to obtain potential gunshot residue ("GSR"), and when the swabs are used and tested, they can help to prove whether someone was in the vicinity of a gun when it was fired. Cook testified as follows:

Q. And what's the purpose of administering one of these gunshot residue kits?

A. If you said that, you know, you were nowhere near a gun when it went off, it would help to prove whether you were in the vicinity of a gun when it went off or you weren't.

Q. Would it help to prove if you were handling a firearm of sort?

A. Only if it's fired, if it had that residue still on it.

One of the GSR kits in this case was used to swab Daniel McGee and the other was used to swab Michael Faulkner, and the swabs were sent to DPS for analysis and testing.

Testimony of Wafaa Evey

Wafaa Evey testified that in 2021, she was employed as a crime analyst for the Conroe Police Department, where she assisted detectives in collecting evidence and crime analysis. Evey recalled her sergeant notified her about a shooting at an apartment complex in Conroe that occurred on May 12, 2021, and he told her the police were looking for a silver Kia with Colorado plates. Evey testified that she used the Flock system, a system that collects images from license plate readers, to

10

search for "any vehicle that [was] in Conroe that has displayed a Colorado license plate[]" for May 12, 2021, between 7 and 9 a.m. One of the images Evey obtained shows a silver Kia with a black panel and a Colorado license plate. Evey testified that when she performed a search covering a 30-day period, she found an image of the same Colorado license plate on a silver Ford Fiesta, and she later determined that the owner of the Fiesta had reported that her Colorado license plates were stolen. According to Evey, the location where the plates were stolen from the Fiesta was "five to ten minutes[]" away from the Walmart in Conroe. After reviewing the surveillance video from Walmart, Evey concluded that the two suspects entered the Walmart together, and they left the store together.

Testimony of Sergeant Thomas Bean

Sergeant Thomas Bean with the Walker County Sheriff's Department testified that, on May 12, 2021, he was notified about a pursuit of a vehicle that had occurred in Walker County, that the sheriff's office was bringing two men to the Walker County jail, and that the Conroe Police Department had requested GSR testing of the men. According to Bean, "the labs [] don't accept GSR kits if they are out of a certain time frame[,] which I believe is four hours [of the firearm being shot]. And [] they wanted to get these GSR kits done and in a timely manner so they would be accepted by a lab." Bean testified that when a gun is fired, it expels gas together with particles that are called "gunshot residue," and the purpose of collecting GSR

11

samples is "to find out if somebody was around a gun that was shot or if they actually shot a gun." Bean testified that while wearing white gloves, he obtained the GSR swab from Daniel McGee at 9:35 a.m. and the GSR swab from Michael Faulkner at 9:38 a.m.

On cross-examination, Bean testified that there was no written guidance requiring that GSR kits be taken within four hours, but "[i]t's just the lab's preference." Bean agreed that it was possible that Faulkner's handcuffs could have contaminated him for GSR or for an arresting officer to transfer GSR. The defense asked Bean why bags were not used to cover the hands of the suspects, and Bean testified that, in his experience, bags are only used to cover the hands of a deceased person who will be tested for GSR. Bean explained that he has "never seen anybody put bags on the hands of a live person[.]"

Testimony of Rebekah Lloyd

Rebekah Lloyd testified that she is a forensic scientist in the trace evidence section of the Texas DPS Crime Laboratory in Austin. Lloyd testified that trace evidence deals with the scientific principle that "when two objects come into contact, a transfer of material happens[,]" and this principle applies to gunshot primer residue. According to Lloyd, when a gun is shot, heat and pressure vaporize metal with the cartridge, and the vaporized metals can land on parts of the gun or on hands, clothing, persons, or objects near the gun. Lloyd testified that, if a sample is not

collected within four hours of an incident, her lab will not test the sample. She also testified that studies by the FBI conclude that between four to six hours is a reasonable time to collect GSR after an incident. According to Lloyd, most GSR kits include two stubs with carbon adhesive that are rubbed on a suspect's hand, one stub for each hand, although some kits include four stubs for the palm and back of each hand. Lloyd further testified that the kits in this case conformed to her lab's policies, and the kits were tested.

Lloyd agreed that she was assigned to test the samples taken from Daniel McGee and Michael Faulkner. Lloyd identified State's Exhibit 97 as her report from the testing results in this case, and reading from her report, Lloyd testified about the results of her testing of McGee:

> Six characteristic gunshot primer residue particle(s) were confirmed on the GSR kit. This result is consistent with a person having recently: A, fired a weapon; B, Been in immediate proximity of a weapon as it is being fired; or, C, come into contact with a surface containing gunshot primer residue particles. Other characteristics and indicative gunshot primer residue particles were detected on the GSR kit, but were not confirmed.

Lloyd also read the results of her testing of the sample from Michael Faulkner:

> One characteristic and two indicative gunshot primer residue particle(s) were confirmed on the GSR kit. This result is consistent with a person having recently: A, fired a weapon; B, been in immediate proximity of a weapon as it is being fired. Or, C, come into contact with a surface containing gunshot primer residue particles.

Lloyd testified that gunshot residue can be transferred from one hand to another or between an object and a hand. She also agreed that a person could get GSR on their hands after touching or handling a firearm that had been recently fired.

Testimony of Jeffrey Kelly

Jeffrey Kelly testified that he works for the DPS Safety Crime Lab in El Paso as a forensic scientist in the firearm and toolmark section. He testified that the lab submission in this case originally went to the Houston lab but was then forwarded to the El Paso lab because it had a slower workload. Kelly testified that he fired three bullets from the gun he received in this case and then compared the spent casings to the fired cartridge casings collected at the scene where the shooting occurred. He agreed that he stated in his report that one of the bullet fragments he received as evidence was fired from the Ruger pistol, which he was sent as part of the evidence in Faulkner's case. According to Kelly, the fragment that he examined and compared in Faulkner's case was extracted from the victim.

Testimony of "Beth" [3]

Beth testified for the defense and stated she was fourteen years old and in the ninth grade. Beth recalled that on May 12, 2021, there was a shooting at the apartment complex where she lives. Beth also recalled that after the incident, she met with someone from Safe Harbor about the incident. Beth testified that on May

---

[3] We use a pseudonym to identify this witness.

12, she heard gunshots while she was waiting for the bus in a location that she described as being approximately twenty feet from the driveway of her apartment complex. Beth testified that she saw a passenger get out of the vehicle, the passenger entered the vehicle, then the passenger "[went] back and sho[]t at the guy." After that, Beth said, she saw the shooter get back in the car, which sped away. According to Beth, the man who got out of the vehicle was wearing a ski mask, gloves, and black clothing. She testified that she did not see the car's driver do much and that she could not see who was driving the car.

Defense Exhibit 4 was played for the jury, and in a portion of the video, Beth is heard saying that the driver stayed in the car and "I don't think the driver had anything to do with it."

Testimony of Michael Faulkner

Faulkner testified in his own defense. He testified that the reason he went to Conroe with Daniel McGee was "to get some cheap drugs." According to Faulkner, they left Dallas at about 2 a.m. after "partying" on methamphetamines, and McGee told him he would give Faulkner a portion of the drugs to be obtained in Conroe. According to Faulkner, he did not know the person they were going to meet in Conroe.

Faulkner testified that when they arrived in Conroe, McGee directed him to an apartment complex where McGee got some license plates and put them on

15

Faulkner's vehicle while Faulkner stayed in the car "smoking a bowl[]" of methamphetamines. Faulkner further testified that he and McGee then went to a Walmart where McGee shopped but Faulkner said he did not do any shopping, although McGee called Faulkner back into the store to give him some change.

Faulkner testified that he parked in the parking lot at the apartment complex but later moved the car onto the street. Faulkner also testified that McGee got out of the car, and Faulkner stayed in the car listening to loud music. According to Faulkner, when McGee came back to the car, McGee pointed a gun at him and told him to "go." Faulkner testified that he drove to Huntsville, and he did not stop the car even though a police officer was behind him because McGee told him not to stop. Faulkner testified that, when the police laid down spike strips, McGee told him not to say anything, but when he was taken to the Walker County Sheriff's Department, he gave a statement to the police.

On cross-examination, Faulkner agreed that he and McGee "made a plan" to go to Conroe together. Faulkner agreed that they drove to Conroe in his car, a silver Kia with a black fender. He also agreed that a stolen license plate was placed on his car.

Faulkner testified that he went to Walmart with McGee, and he gave McGee some money for the items that McGee purchased. Faulkner agreed that they drove to the apartment complex, and he first pulled into the parking lot of the apartment

16

complex, and then he moved the car onto the street. Faulkner also agreed that the victim was shot twice, that eleven bullets were fired from the first part of the clip, and after a short pause, two more bullets were fired. He agreed he was in his car when the shooting occurred, but he said he did not hear anything that happened outside the car. Faulkner agreed that, after the shooting, McGee got back into Faulkner's car and they drove away, traveling at a speed of more than 100 miles an hour towards Huntsville. He further agreed that "it took DPS laying spikes on the ground to get [him] to stop[]" and that when he was taken out of the car, he was wearing a black mask around his neck and a black hoodie. According to Faulkner, he did not tell the police that there was a gun pointed at him, or that he was threatened or scared, and he did not tell the police that he had stolen license plates on his car.

At the end of the State's case in chief, the defense moved for a directed verdict, which the trial court denied. At the end of the defense's case in chief, the defense again moved for a directed verdict, which the trial court denied.

The jury charge included an instruction on the law of parties. The jury found Faulkner guilty as charged. After a hearing on punishment, the jury found the enhancement allegation "true" and assessed punishment at thirty years of imprisonment. Faulkner filed a Motion for New Trial, arguing that the verdict was contrary to the law and evidence. The motion for new trial was overruled by operation of law. Faulkner timely filed a Notice of Appeal.

Issues

On appeal, Faulkner raises three issues, which we quote as follows:

First Issue: Did the trial court err by denying Appellant's Motion to Suppress gunshot residue ("GSR") evidence?

Second Issue: Did the trial court err by denying Appellant's requested changes to the jury charge in the guilt-innocence phase of trial when Appellant requested a jury charge on mistake of fact?

Third Issue: Did the trial court err by not allowing the defense to admit a video containing a statement of the victim in this case?

Motion to Suppress

In his first issue, Appellant argues that the trial court erred by denying his motion to suppress the gunshot residue ("GSR") evidence. According to Appellant, the results should have been suppressed because of "possible transfer of GSR" because Officer Posey touched him when he was arrested and because the results from the collection of the GSR were "not reliable under the conditions[.]"

On a motion to suppress, we use a bifurcated standard of review. *See State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019); *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019); *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We give the trial court almost complete deference in its determination of historical facts, especially if it is based on an assessment of demeanor and credibility, in its rulings on application of law to questions of fact and to mixed questions of law and fact if those questions depend on an evaluation of

demeanor and credibility. *See Martinez*, 570 S.W.3d at 281. We review questions of law de novo. *Id.* We view the record in the light most favorable to the trial court's ruling, and we uphold the ruling if it is supported by the record and is correct under any theory of the law applicable to the case. *See Ruiz*, 577 S.W.3d at 545.

At a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony, and a trial court may choose to believe or disbelieve all or any part of a witness's testimony. *Valtierra*, 310 S.W.3d at 447; *Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007) (quoting *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999)); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When reviewing a trial court's ruling, the appellate court does not engage in its own factual review. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). We give almost total deference to the trial court's determination of historical facts, "especially if those are based on an assessment of credibility and demeanor." *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). We give the same deference to the trial court's conclusions with respect to mixed questions of law and fact that turn on credibility or demeanor. *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012). We review purely legal questions de novo as well as mixed questions of law and fact that do not turn on credibility and demeanor. *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011); *Crain*, 315 S.W.3d at 48.

19

When, as here, there are no findings of fact and none were requested, an appellate court must presume that the trial court implicitly resolved all issues of historical fact and witness credibility in the light most favorable to its ruling. *State v. Elias*, 339 S.W.3d 667, 674 (Tex. Crim. App. 2011) (citing *Ross*, 32 S.W.3d at 857). We will uphold the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014); *Arguellez v. State*, 409 S.W.3d 657, 662-63 (Tex. Crim. App. 2013); *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

Appellant's pre-trial motion to suppress argued that, when law enforcement officers initially stopped Appellant on the day of the incident, they "physically searched" him, they placed him in a police vehicle, and Appellant was tested for GSR about an hour to an hour-and-a-half after he was arrested. According to the motion, the area on Appellant that was tested for GSR was not properly preserved:

> Prior to the "dabbing" of the defendant's hands he was 1) handled by multiple officers; 2) the defendant was placed in handcuffs by an officer that had been handling a firearm in the minutes before he was manacled; 3) the defendant was placed in a patrol vehicle with his hands behind his back; 4) at no time were the defendant's hands "bagged" to preserve any evidence and to avoid transference; 5) the defendant's clothing was not tested nor preserved in a satisfactory manner; 6) the defendant's face and neck were not tested; 7) the manner of the test was not reported and it is unknown where the testing took place, the conditions of the environment where the test was administered nor was the method or "grid" of the "dabbing"; 8) comparative or disqualifying tests of the law enforcement officers

20

that handled, cuffed and transported the defendant were not done; [and] 9) a comparative test of the seat or seats of the vehicle or vehicles that the defendant was place[d] inside of was not done[.]

Appellant sought to suppress the results of the GSR testing based on "illegal and unjust conduct."[4] At the hearing on the motion to suppress, defense counsel told the court that the conditions under which the GSR was collected in this case did not conform to the procedures in the DPS lab handbook and stated, "[t]his is not reliable under the conditions that it was done under."

In his brief on appeal, Appellant argues that the results of the GSR testing were not reliable under *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992), because the same officer who handcuffed Appellant had recently handled a gun so that "transference was a possibility," and because procedures required by *Kelly* were not followed. Specifically, Appellant argues that the GSR evidence obtained violated the *Kelly* requirement that "the technique must have been properly applied on the occasion in question." *Kelly*, 824 S.W.2d at 573.

Under *Kelly*, the trial court acts as a gatekeeper to determine the reliability, relevancy, and admissibility of scientific evidence. *Wells v. State*, 611 S.W.3d 396, 426 (Tex. Crim. App. 2020) (citing *Vela v. State*, 209 S.W.3d 128, 136 (Tex. Crim. App. 2006)). Applying *Kelly*, a court applies the test stated in *Kelly* to evaluate

---

[4] On appeal, Appellant does not argue that the GSR collection was "illegal," and he only argues that "the gunshot residue was collected in violation of the third prong under *Kelly*[.]"

21

reliability: (1) the underlying scientific theory must be valid, (2) the technique applying the theory must be valid, and (3) the technique must have been properly applied on the occasion in question. *See Wells*, 611 S.W.3d at 426 (citing *Kelly*, 824 S.W.2d at 573). In this case, Appellant's motion to suppress argued—without a specific reference to *Kelly*—that "the proper preservation of the tested area on the defendant was not done." An appellate court reviews a trial court's ruling in this context for an abuse of discretion. *See Kelly*, 824 S.W.2d at 574.

The State argues that Appellant failed to preserve his complaint that the admission of the GSR evidence did not conform to the *Kelly* standards because he failed to make this objection to the trial court.[5] A motion to suppress is a specialized means of objecting to the admissibility of evidence. *Galitz v. State*, 617 S.W.2d 949, 952 n.10 (Tex. Crim. App. 1981). Therefore, a motion to suppress must meet the requirements of an objection, including that it be both timely and sufficiently specific to inform the trial court of the complaint. *See Trejo v. State*, 594 S.W.3d 790, 799 (Tex. App.—Houston [14th Dist.] 2019, no pet.). To preserve an issue involving the admission of evidence for appellate review, the objection must inform the trial court why, or on what basis, the evidence should be excluded, but generally

---

[5] The State also argues that Appellant failed to preserve error because he did not obtain a Rule 702 hearing in the trial court. We do not read Appellant's brief to complain of error under Rule 702. Neither his motion to suppress nor his brief on appeal cite to Texas Rule of Evidence 702. *See* Tex. R. Evid. 702 ("Testimony by Expert Witnesses.").

need not use "magic words." *Ford v. State*, 305 S.W.3d 530, 533 (Tex. Crim. App. 2009); *see also* Tex. R. App. P. 33.1(a)(1)(A) (requiring an objection be made "with sufficient specificity to make the trial court aware of the complaint[]"); *Resendez v. State*, 306 S.W.3d 308, 312-13 (Tex. Crim. App. 2009). "The specificity requirement is met if the complaint made at trial was clear enough for the trial judge so as to permit the trial judge to take corrective action when the complaint was made." *Lovill v. State*, 319 S.W.3d 687, 691 (Tex. Crim. App. 2009).

When the State offered the GSR into evidence, the defense objected as follows:

> [I]t's a violation of his due process.[6] He's entitled to be treated fairly throughout the investigation. And the basis of the motion to suppress is on the cross contamination that has occurred here. I've already gotten it out of Officer Posey that he is a firearm enthusiast, he handled this firearm during the scene. Other law enforcement officers were there with firearms that also handled [Faulkner], that these tests could be false positives.

The trial court then stated, "that's a cross-examination and evidentiary issue, not a suppression issue." The defense argued that the GSR test was not performed until Faulkner was at the police station, after he had "been handled by Officer Posey[]" and was handcuffed. Defense counsel argued that touching by officers was "[t]ransference of trace evidence." According to the defense, "the test wasn't done

---

[6] Although Appellant argued in the trial court that admission of the GSR evidence was a violation of his due process rights, he does not make this argument on appeal.

under the right conditions[]" and the test was "not reliable under the conditions that it was done[.]" The trial court denied the motion to suppress and agreed with the State that any issue about how Faulkner was handled would go to the weight and not the admissibility of the results.

Assuming without deciding that Appellant preserved error on this issue and deferring to the trial court's role as gatekeeper under *Kelly* and its role as factfinder on a motion to suppress, we conclude that the trial court did not err by denying his motion to suppress the GSR evidence. *See Wells*, 611 S.W.3d at 426; *Martinez*, 570 S.W.3d at 281. We note that Appellant has not challenged the scientific validity of the GSR collection and testing methodology but only that the GSR kit was collected after the defendant had been handled by the officers in this case. *See Wells*, 611 S.W.3d at 426 (citing *Kelly*, 824 S.W.2d at 573) (explaining that the first two requirements under *Kelly* are the validity of the underlying scientific theory and the technique applying the theory). While the record indicates Officer Kenneth Posey put handcuffs on Faulkner after handling his own pistol, Posey testified that he did not fire his pistol on May 12, and he could not remember the last time he had fired his gun before the shooting occurred.

Sergeant Thomas Bean testified that he wore gloves when he obtained the GSR sample from Faulkner. On cross-examination, Bean testified that, for submission to DPS, GSR samples should be collected within a four-hour window.

He also agreed that it is possible "[g]unshot residue can be transferred a lot of different ways." According to Bean, in his experience, a deceased person's hands are bagged before testing for GSR, but he had not ever seen bags used on live people. Rebekah Lloyd, the forensic scientist who analyzed the GSR samples, testified that DPS will not analyze a GSR sample that is collected more than four hours after an incident, and the samples in this case met that policy. Lloyd testified that "[t]he time of the incident was 5/12/2021 at 8:15 a.m. And the time of the kit for Michael Faulkner was at 5/12/2021 at 9:38 a.m." On cross-examination, Lloyd testified that GSR can be transferred from hand to hand, from hand to object, and from object to hand, and the main way that someone gets GSR on their hands is from touching or handling a firearm that has been recently fired. She also testified that it is possible for a person to have GSR on their hand if they had touched another person who had recently fired a weapon.

On this record, the trial court could have concluded that the evidence reflects that the GSR samples were reliable and taken using the properly applied technique. *See Wells*, 611 S.W.3d at 426 (citing *Kelly*, 824 S.W.2d at 573). The trial court could have determined that the jury as factfinder could consider Lloyd's testimony about transference of GSR—as well as other testimony about collecting the GSR samples—in determining what weight to give to the GSR evidence results. *See Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). The trial court's

25

ruling was within the zone of reasonable disagreement. *See Valadez v. State*, 663 S.W.3d 133, 143 (Tex. Crim. App. 2022). We conclude that the trial court did not err in denying Appellant's motion to suppress and admitting the GSR evidence. *See Kelly*, 824 S.W.2d at 574. We need not conduct a harm analysis. *See Hawkins v. State*, 135 S.W.3d 72, 76 (Tex. Crim. App. 2004) ("A harm analysis is employed only when there is error, and ordinarily, error occurs only when the trial court makes a mistake."). We overrule Appellant's first issue.

Jury Charge Error

In his second issue on appeal, Appellant argues that the trial court erred by denying his request for a jury charge on "mistake of fact." Appellant contends that he was entitled to a jury instruction on mistake of fact because his testimony raised the issue. In the trial court, the Appellant argued as follows:

> The defendant formed a *reasonable belief* that the sole purpose of the journey from the Dallas area to Conroe was to acquire drugs from someone known to Daniel McGee. Shortly after the defendant was arrested, the defendant told detectives why he was in the area. The purchase and transportation of illegal narcotics is significantly different than aggravated assault with a deadly weapon. By all accounts there was one shooter, and that shooter was Daniel McGee. The defendant *reasonably believed* that Daniel McGee was directing him to the purchase of narcotics; not for McGee's opportunity to physically harm [the victim] with a firearm.

Appellant also argued that he had a "culpable state of mind for a different crime[]" than the crime for which he was charged.

26

We review a claim of jury charge error under the two-pronged test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). *Campbell v. State*, 664 S.W.3d 240, 245 (Tex. Crim. App. 2022). First, we determine if there is jury charge error. *See id.* (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)). If we determine that error exists, then we conduct a harm analysis. *See id.* Where, as here, there was a timely objection in the trial court, the record only needs to show "some harm" to justify reversal of the conviction. *See Almanza*, 686 S.W.2d at 171. "Some harm" means actual harm and not merely a theoretical complaint. *Campbell*, 664 S.W.3d at 245 (citing *Cornet v. State*, 417 S.W.3d 446, 449 (Tex. Crim. App. 2013); *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012)). In assessing "some harm," we consider (1) the entire jury charge, (2) the state of the evidence, (3) the jury arguments, and (4) if applicable, any other relevant information in the record considered as a whole. *See id.* (citing *Almanza*, 686 S.W.2d at 171). "Neither party bears the burden to show harm." *Id.* (citing *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016)). Reversal is required if the error is "'calculated to injure the rights of the defendant,' which means no more than that there must be *some* harm to the accused from the error." *Almanza*, 686 S.W.2d at 171.

We review a trial court's refusal to include a defensive issue in the charge for an abuse of discretion. *Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App.

27

2000). A defendant is entitled to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or uncontradicted, and regardless of how the trial court views the credibility of the defense. *Celis v. State*, 416 S.W.3d 419, 430 (Tex. Crim. App. 2013) (plurality op.) (citing *Allen v. State*, 253 S.W.3d 260, 267 (Tex. Crim. App. 2008)). A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding as to each element of the defense. *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). We must view the evidence in the light most favorable to the defendant's requested submission. *Bufkin v. State*, 207 S.W.3d 779, 782-83 (Tex. Crim. App. 2006).

Section 8.02 of the Penal Code, which governs the mistake-of-fact defense, provides:

> (a) It is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense.
> (b) Although an actor's mistake of fact may constitute a defense to the offense charged, he may nevertheless be convicted of any lesser included offense of which he would be guilty if the fact were as he believed.

Tex. Penal Code Ann. § 8.02. "Negated" is not defined in the Penal Code, but the word "negate" generally means "[t]o deny" and "[t]o nullify; to render ineffective." *Negate*, Black's Law Dictionary (11th ed. 2019). To raise the mistake-of-fact defense here, Appellant must have shown that through mistake, he formed a

reasonable belief about a matter which negated the kind of culpability required to commit the aggravated assault for which he was charged. *See, e.g.*, *Flores v. State*, 573 S.W.3d 864, 867-68 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). A "reasonable belief" is a belief that would be held by an ordinary and prudent person in the same circumstances as the actor. *See* Tex. Penal Code Ann. § 1.07(a)(42). However, "[a] person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that [] a different offense was committed[.]" Tex. Penal Code Ann. § 6.04(b)(1); *Louis v. State*, 393 S.W.3d 246, 253 (Tex. Crim. App. 2012). An instruction is not required if the evidence, viewed in the light most favorable to the defendant, does not establish a mistake of fact defense. *See Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999).

The record indicates that the Appellant was prosecuted for aggravated assault under the law of parties. Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *See* Tex. Penal Code Ann. § 7.01(a). "'Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement.'" *Salinas v. State*, 163 S.W.3d 734, 739 (Tex. Crim. App. 2005) (quoting *Ransom v. State*, 920 S.W.2d 288,

29

302 (Tex. Crim. App. 1994)). Party participation may be shown by events occurring before, during, and after the commission of the offense, and may be demonstrated by actions showing an understanding and common design to do the prohibited act. *Id.* at 739-40. "Circumstantial evidence alone may be used to prove that a person is a party to an offense." *Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006).

We previously addressed a court's denial of a jury instruction on mistake of fact in *Traylor v. State*, 43 S.W.3d 725 (Tex. App.—Beaumont 2001, no pet.). Traylor was convicted of assault on a public servant, and he testified that he did not realize the victim was a police officer. *Id.* at 726-27. In that case, we concluded there was no error in not giving an instruction on mistake of fact, applying the reasoning in *Bruno v. State*, 845 S.W.2d 910 (Tex. Crim. App. 1993) (plurality op.). *See Traylor*, 43 S.W.3d at 730-31. In *Bruno*, the Court of Criminal Appeals held that a mistake of fact instruction was unnecessary because the jury could not have convicted the defendant if they believed his story even without the mistake of fact instruction:

> The jury heard both stories. As they would have necessarily been required to disbelieve appellant's story before they could find sufficient evidence to convict, the instruction need not have been given in the instant case.

845 S.W.2d at 913; *see also Traylor*, 43 S.W.3d at 730-31.[7] Faulkner contends that he mistakenly believed they were going to Conroe to acquire drugs, and he did not know that McGee was going to shoot someone.

The jury heard Faulkner testify that he went to Conroe with McGee to get "cheap drugs."[8] The jury also heard evidence that Faulkner drove McGee to Walmart and gave McGee money towards the purchase of gloves and masks; Faulkner drove McGee to the apartment complex where the shooting occurred; Faulkner stayed in his car while McGee fired eleven shots, then paused, and then fired two more shots; Faulkner drove McGee away from the apartment complex after the shooting; Faulkner and McGee were apprehended after a high-speed chase across county lines and involving multiple law enforcement agencies; Faulkner was wearing a mask around his neck when he was apprehended; and Faulkner did not tell police that McGee had forced him to flee or that McGee pointed a gun at him.

Even assuming that Faulkner thought he was just going to obtain drugs, that would not negate or nullify an intent to inflict serious bodily harm—both could be true. *See, e.g.*, *Plummer v. State*, 426 S.W.3d 122, 127-28 (Tex. App.—Houston [1st

---

[7] *See also Hopson v. State*, No. 14-08-00735-CR, 2009 Tex. App. LEXIS 2903, at *10 (Tex. App.—Houston [14th Dist.] Apr. 28, 2009, no pet.) (mem. op., not designated for publication) ("As in *Bruno* and *Traylor*, appellant could not have been convicted under the charge [] had the jury believed her story that she lacked the intent to commit theft. Apparently, they did not.").

[8] The jury charge included an instruction on duress.

Dist.] 2012) (purported mistake of fact about whether defendant was still a peace officer did not apply because it did not negate defendant's having intentionally or knowingly possessed a firearm), *reformed on other grounds and aff'd as reformed*, 410 S.W.3d 855 (Tex. Crim. App. 2013); *Anderson v. State*, 11 S.W.3d 369, 373 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (in a prosecution for aggravated assault of a public servant, appellant's evidence must have shown that, through mistake, he formed a reasonable belief that the victim was not a public servant). And under the doctrine of transferred intent, the intent to buy drugs does not relieve a defendant of culpability if, as here, another crime (aggravated assault) was actually committed. *See* Tex. Penal Code Ann. § 6.04(b)(1); *Louis*, 393 S.W.3d at 253.

Even if the jury believed Faulkner's stated subjective intent that he went to Conroe to get drugs, that intent would not negate or nullify the intent to assist or promote in the commission of aggravated assault under the law of parties. *See* Tex. Penal Code Ann. §§ 7.01(a), 8.02(a); *Salinas*, 163 S.W.3d at 739-40; *see also Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996) (intent may be inferred from circumstantial evidence); *LaSalle v. State*, 973 S.W.2d 467, 473 (Tex. App.—Beaumont 1998, pet. ref'd) (same). By finding Faulkner guilty, the jury necessarily rejected any of his testimony suggesting that his participation in the incident and getaway was because he was forced to at gunpoint. *See Bruno*, 845 S.W.2d at 913; *Traylor*, 43 S.W.3d at 730-31; *see also Clay v. State*, 240 S.W.3d 895, 905 n.11

(Tex. Crim. App. 2007) ("Evidence of flight evinces a consciousness of guilt."). Viewing the evidence in the light most favorable to the Appellant, we conclude that an instruction on mistake of fact was not warranted. *See Granger*, 3 S.W.3d at 38. Therefore, we conclude that the trial court did not abuse its discretion by refusing to give a jury instruction on mistake of fact. *See Wesbrook*, 29 S.W.3d at 122. Finding no error, we need not conduct a harm analysis. *See Hawkins*, 135 S.W.3d at 76. We overrule Appellant's second issue.

Exclusion of the Victim's Recorded Statements

In his third issue, Appellant argues that the trial court erred by excluding a video of the victim's statement to law enforcement. According to Appellant, the victim gave his statement at a hospital, he "appeared upset and was in pain[,]" and he was "stressed under the situation that he was in." Appellant argues that, under the circumstances, the recorded statement was an excited utterance, and it was admissible as an exception to the rule against hearsay. He also alleges he was harmed by the exclusion because the victim's statement would have supported Appellant's defensive theory that Appellant was "not a party to this offense and was under a mistake of fact as to why Mr. McGee wanted to drive to Conroe."

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Valadez*, 663 S.W.3d at 143 (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)). "There is no abuse of discretion if the

trial court's ruling is within the zone of reasonable disagreement." *Id.* (citing *De La Paz v. State*, 279 S.W.3d 336, 343-44 (Tex. Crim. App. 2009)). We will not reverse a trial court's decision absent a clear abuse of discretion. *See Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005).

Texas Rule of Evidence 803(2) sets out the excited utterance exception to the general rule of excluding hearsay evidence, and it defines an excited utterance as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." *See* Tex. R. Evid. 803(2); *see also Coble v. State*, 330 S.W.3d 253, 294 (Tex. Crim. App. 2010). The excited utterance exception is based on a psychological fact "that when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood and the truth will come out." *See Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003) (internal quotations omitted). Evidence of an excited emotional state, standing alone, is not enough to qualify a statement as an excited utterance. *See Martinez v. State*, 178 S.W.3d 806, 814-15 (Tex. Crim. App. 2005). In deciding whether a hearsay statement qualifies as an excited utterance, a court may consider the time elapsed, whether the statement was in response to a question, the speaker's demeanor, and whether the statement is self-serving. *See Apolinar*, 155 S.W.3d at 190-91; *Zuliani*, 97 S.W.3d at 595 (citations omitted). The critical determination is whether the speaker was "still dominated by

the emotions, excitement, fear, or pain of the event" and whether circumstances reflect that the statement resulted from impulse and not from reason and reflection. *See Zuliani*, 97 S.W.3d at 596 (citations omitted); *see also Sandoval v. State*, 409 S.W.3d 259, 284-85 (Tex. App.—Austin 2013, no pet.) (explaining that key factors are whether the statement was spontaneous and whether it was made before the declarant's excitement had abated).

On direct examination, Officer Tullis testified that he went to the hospital to see the victim and to get more information about possible suspects. Tullis agreed that the victim appeared to be upset and in pain and that Tullis's body camera captured his conversation with the victim. On cross-examination, defense counsel asked Tullis what kind of information he received from the victim, and the State objected based on hearsay. Defense counsel told the trial court that the statement was an exception to hearsay because it was an excited utterance or a present sense impression. The State responded that "[j]ust because somebody is in pain does not make every statement they make then after being in pain an excited utterance." The trial court sustained the objection. After some additional questioning, the State continued to object, stating that any stress the victim was under at the time related to his impending surgery and not events that happened an hour earlier. After viewing the video exhibit, the trial court stated as follows:

> I've reviewed a significant portion of the video of the complaining witness in the hospital that I believe is Defense 2. The theory was it

35

would not be admitted under an excited utterance. He does not appear to be under the effects of a significant emotional event at the time of this interview, so I'm going to sustain their objection to hearsay.

Defense Exhibit 2 was included in the record for appellate purposes. It depicts Officer Tullis questioning the victim, who is lying on a hospital bed, while another officer takes photos of the victim's wounds. The victim tells Tullis that he recalled more than five shots, and he thought the person who shot him was Hispanic, but he was not sure. He also recalled that the man returned to a "lighter-colored vehicle." The victim told Tullis that, at some point, the vehicle backed away and bumped into the gunman. During the interview, the victim acknowledged that he did not have a clear memory of the incident. The victim also stated, "I don't know if he had [] a second driver with him." The video does not show that the victim was receiving medical treatment at the time of the interview with Officer Tullis.

The record shows that the victim's statements in the excluded exhibit were made in the hospital after the shooting. The victim's statements were in response to questions by Officer Tullis and not on the victim's own initiative. The court had already reviewed the body camera video from officers at the scene showing the victim complaining of pain while being treated by emergency responders at the scene who were trying to stop his bleeding, and the court could have compared the victim's demeanor at the time of the shooting to his demeanor while talking to Officer Tullis later at the hospital. On this record, the trial court could reasonably conclude that the

victim was not still dominated by emotion, excitement, fear, or pain when he made the statements in the hospital that were captured by Tullis's body camera. *See Zuliani*, 97 S.W.3d at 595-96. We cannot say the trial court clearly abused its discretion by excluding the exhibit. *See Apolinar*, 155 S.W.3d at 186. Because we find no error, we need not conduct a harm analysis. *See Hawkins*, 135 S.W.3d at 76. We overrule Appellant's third issue.

Having overruled all of Appellant's issues, we affirm the trial court's judgment of conviction.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on December 20, 2023
Opinion Delivered January 17, 2024
Do Not Publish

Before Horton, Johnson and Wright, JJ.